1  Christopher T. Micheletti (SBN 136446)
   Judith A. Zahid (SBN 215418)
2  Qianwei Fu (SBN 242669)
   **ZELLE LLP**
3  44 Montgomery Street, Suite 3400
   San Francisco, CA 94104
4  Telephone: (415) 693-0700
   cmicheletti @zelle.com
5  jzahid@zelle.com
   qfu@zelle.com
6

7  James R. Martin (SBN 173329)
8  Jennifer Duncan Hackett (*pro hac vice* forthcoming)
   **ZELLE LLP**
9  1775 Pennsylvania Avenue, NW, Suite 375
   Washington, D.C. 20006
10 Telephone: (202) 899-4100
   jmartin@zelle.com
11 jhackett@zelle.com

12
   *Attorneys for Plaintiff Craig Kelly*
13
                    **UNITED STATES DISTRICT COURT**
14                 **NORTHERN DISTRICT OF CALIFORNIA**

15

16 | CRAIG KELLY, on behalf of himself and all others similarly situated, | Case No. |
17 | | |
   | Plaintiff, | **CLASS ACTION COMPLAINT** |
18 | vs. | |
   | | **JURY TRIAL DEMANDED** |
19 | VITOL INC., SK ENERGY AMERICAS, INC., SK TRADING INTERNATIONAL CO. LTD., DAVID NIEMANN, and BRAD LUCAS, | |
20 | | |
21 | | |
22 | Defendants. | |

23

24

25

26

27

28

**TABLE OF CONTENTS**

I.  INTRODUCTION ................................................................................ 1

II.  JURISDICTION AND VENUE ......................................................... 3

III.  PARTIES .......................................................................................... 4

   A.  Plaintiff ...................................................................................... 4

   B.  Defendants ................................................................................. 4

IV.  AGENTS AND CO-CONSPIRATORS ........................................... 6

V.  CLASS ACTION ALLEGATIONS ................................................. 7

VI.  FACTUAL ALLEGATIONS ............................................................ 9

   A.  California's Gasoline Market .................................................... 9

   B.  Gasoline Spot Market Trading In California ........................... 11

   C.  Regulations Governing California Spot Market Trading.......... 14

   D.  Defendants' Participation in the California Spot Market .......... 15

   E.  Defendants' Unlawful Conduct ............................................... 16

VII.  PLAINTIFF AND THE CLASS SUFFERED ANTITRUST INJURY .................... 27

VIII.  TOLLING OF THE STATUTES OF LIMITATIONS ............................ 30

IX.  CLAIMS FOR RELIEF ................................................................... 32

COUNT ONE.................................................................................... 32

COUNT TWO.................................................................................... 33

COUNT THREE................................................................................ 34

COUNT FOUR.................................................................................. 35

PRAYER FOR RELIEF ...................................................................... 36

JURY TRIAL DEMANDED................................................................ 37

CLASS ACTION COMPLAINT

Plaintiff Craig Kelly ("Plaintiff"), on behalf of himself and all others similarly situated, brings this Class Action Complaint for damages, restitution, and injunctive relief against Defendants Vitol Inc. ("Vitol"), SK Energy Americas, Inc. ("SK Energy"), SK Trading International Co. Ltd. ("SK Trading"), David Niemann, and Brad Lucas (collectively "Defendants") for violations of, *inter alia*, Section 1 of the Sherman Act (15 U.S.C. § 1), the California Cartwright Act (Cal. Bus. & Prof. Code §§16720 *et seq.*), and the California Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200 *et seq.* ("UCL")).  All allegations herein other than those concerning the Plaintiff are based on information and belief.

## I.    **INTRODUCTION**

1.    This lawsuit involves *per se* unlawful agreements among horizontal competitors—Vitol, SK Energy, and SK Trading, and certain of their employees—to restrain competition in the spot market for gasoline formulated for use in California and in gasoline blending components used in that gasoline.

2.    During all relevant times during the time period February 18, 2015 to at least December 31, 2016, Defendants were participants in the spot market for delivery of refined gasoline and gasoline blending components to refineries located in California.

3.    Defendants' illegal scheme commenced as a result of a disruption in certain refining capacity that occurred at the ExxonMobil refinery in Torrance, California on February 18, 2015. Portions of that refinery—specifically the refinery's cracking unit—exploded in the early morning hours of February 18, 2015 and, as a result, eliminated certain portions of that refinery's ability to refine alkylates that are blended with gasoline in order to boost octane ratings between February 2015 and June 2016.

4.    Immediately upon learning of the explosion at the Torrance refinery, Defendants Vitol and SK Energy negotiated large contracts to supply gasoline and gasoline blending components for delivery in California.  The largest of these contracts exceeded more than ten million gallons.

5.      Additionally, Defendants Vitol and SK Energy agreed with each other to manipulate the spot market price for refined gasoline and gasoline blending components so that they could realize windfall profits on these contracts.  Defendants further entered into agreements with each other to share the profits and disguise their illegal conduct.

6.      The restraint of trade described herein was coordinated by the lead traders for both Vitol and SK Energy, who were friends and former colleagues at Vitol, and it continued until late 2016, when one of the traders left his position with SK Energy.

7.      Prices for spot market gasoline contracts went up almost immediately for deliveries to San Francisco and Los Angeles.  Empirical studies demonstrate that changes in the wholesale price of gasoline are passed through to retail prices, and that wholesale price increases are passed through much more quickly than wholesale price decreases.  In other words, "retail prices continue to respond quickly to increases in the spot price, but they respond more slowly to decreases in the spot price."[1]  Gas prices in California have historically been approximately 30 cents a gallon more than the national average.  Beginning immediately after the crisis precipitated by the Torrance refinery explosion, however, Californians paid a premium of well over 50 cents over the national average, and continued to do so until well after the explosion's effects on supply had dissipated.

8.      On May 4, 2020, following an investigation by the California Attorney General's Office, California Attorney General Xavier Becerra filed a complaint (the "AG Complaint") against these Defendants alleging that they "participated in a scheme to drive up and manipulate the spot market price for gasoline so that they could realize windfall profits on these large contracts to deliver gasoline and gasoline blending components."  According to the AG's Complaint, the Defendants reached agreements with each other "to manipulate, raise, fix, and tamper with the spot market price of gasoline in California" and "to share the profits and disguise or hide the nature of the scheme."  By doing so, Defendants both augmented and prolonged the harmful effects of

---

[1] Stillwater Associates, *California Gasoline Retail Margin Quick to Rise, Slow to Drop,* Jan. 10, 2020, *available at* https://stillwaterassociates.com/gasoline-retail-margin-quick-to-rise-slow-to-drop/.

the scheme on competition and consumers.  Defendants' conduct became known for the first time to Plaintiff and the Class upon the filing of the AG Complaint.

9.      Defendants' agreements violated the Sherman Act and California's Cartwright Act, and constituted unlawful, unfair, or fraudulent practices in violation of the UCL.  Plaintiff and the Class were injured because they paid more for gasoline within the State of California than they would have paid in a retail gasoline market untainted by Defendants' illegal conduct.

## II.     JURISDICTION AND VENUE

10.      This Court has diversity jurisdiction under 28 U.S.C. §§ 1332(d) and 1367 because this is a class action in which the amount in controversy is in excess of $5,000,000, excluding interest and costs, and in which some members of the proposed class are citizens of a state different from some Defendants.

11.      This Court has personal jurisdiction over the named corporate defendants because each, directly and/or through its ownership or control of subsidiaries: (a) transacted business in the United States, including in this District; (b) are registered to do business in the state of California; (c) had substantial aggregate contacts with the United States, including this District; and/or (d) engaged in anticompetitive acts that were directed at, and had a direct, substantial, and reasonably foreseeable and intended effect of injuring, the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this District.  Defendants conduct business throughout the United States, including in this District, and have purposefully availed themselves of the laws of the United States.

12.      This Court also has personal jurisdiction over the named individual defendants because each of these individuals transacted business in this District, had substantial aggregate contacts with this District, and/or engaged in anticompetitive acts that were directed at, and had a direct, substantial, and reasonably foreseeable and intended effect of injuring, the business or property of persons and entities residing in, located in, or doing business in this District.

13.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b), (c), and (d),

1  because a substantial part of the events giving rise to Plaintiff's claims occurred in this District, a

2  substantial portion of the affected interstate trade and commerce was carried out in this District,

3  and one or more of the Defendants do business in this District.

4      14.    Assignment to the San Francisco or Oakland Division is appropriate under Local

5  Rule 3-2(c) because a substantial part of the conduct at issue in this case occurred in San Francisco

6  County.

7  ### III.    PARTIES

8  **A.    Plaintiff**

9      15.    Craig Kelly is a citizen of California and resident of Auburn, California.  Mr. Kelly

10  purchased gasoline within California during the time period February 2015 to December 2017.

11  **B.    Defendants**

12      16.    Vitol is a Delaware corporation with its principal place of business in Houston,

13  Texas.  Vitol operates a trading firm and is a subsidiary of Vitol Holding, B.V., an international

14  energy and commodities company based in the Netherlands.  Vitol is registered with the California

15  Secretary of State to conduct business in California.  Vitol and a related entity are recidivist

16  participants in unlawful trading conduct.  The Federal Energy Regulatory Commission sued Vitol

17  and one of its traders to collect $3.75 million in fines levied against them after finding Vitol's

18  trading activity manipulated California electricity markets.[2]  And Vitol S.A. was fined €5 million

19  by French authorities for manipulating the French southern gas trading point "Peg Sud" between

20  June of 2013 and March of 2014.[3]

21      17.    SK Energy is a California corporation with its principal place of business in

22  Houston, Texas.   During the relevant time period, SK Energy functioned as SK Trading's

---

[2] *See Federal Energy Regulatory Comm'n v. Vitol, Inc.*, No. 2:20-cv-00040-KJM-AC (E.D. Cal. Jan. 6, 2020), ECF No. 1.

[3] *See* Reuters, *UPDATE1-French regulator fines Vitol 5 mln euros for gas market manipulation* (Oct. 9, 2018)*, available at* https://www.reuters.com/article/vitol-france-fine-gas/update-1-french-regulator-fines-vitol-5-mln-euros-for-gas-market-manipulation-idUSL8N1WP399.

California trading operation.  Defendant SK Energy is an indirect, wholly-owned subsidiary of Defendant SK Trading.

18.     SK Trading is a South Korean corporation with its principal place of business in Seoul, South Korea.  SK Trading is the parent of SK Energy International and the indirect parent of SK Energy.

19.     SK Energy and SK Trading are subsidiaries of SK Innovation Co., Ltd., a South Korean energy company with its principal place of business in Seoul, South Korea.

20.     SK Energy Co., Ltd., a South Korean oil and energy company and affiliate of Defendants, has a history of violating the Sherman Act, by virtue of its admitted conspiracy with other South Korean entities to rig bids on U.S. Department of Defense contracts to supply fuel to U.S. military bases throughout South Korea beginning in 2005 and continuing until 2016.  In March 2019, SK Energy Co., Ltd. agreed to pay $90 million to satisfy civil antirust claims alleged by the U.S.

21.     SK Trading dominated and controlled SK Energy, and specifically ratified the illegal conduct engaged in by SK Energy that is described herein.  SK Trading and SK Energy Korea list their headquarters at the same address as SK Innovation and SK Energy Co., Ltd.

22.     At all times relevant to this Complaint, Defendant SK Energy was an agent and alter ego of Defendant SK Trading, due to the nature and extent of control that SK Trading exercised over SK Energy.

23.     At all times relevant to this Complaint, there existed a unity of interest and ownership between SK Energy and SK Trading such that any separateness between them had ceased to exist and SK Trading controlled, dominated, managed, and operated SK Energy.

24.     Specifically, SK Trading controlled the business and affairs of SK Energy such that the distinction between the companies were mere technicalities.

25.     Additionally, at all times relevant to this Complaint, SK Energy was acting within the course and scope of its agency with the knowledge, consent, permission, authorization, and

ratification, either express or implied, of SK Trading in performing the acts alleged in this Complaint.

26.     The SK entities were principals, agents, alter egos, joint venturers, partners, or affiliates of each other, and in doing the acts alleged herein, were acting within the course and scope of that principal, agent, alter ego, joint venture, partnership, or affiliate relationship.

27.     During the relevant period, Defendant David Niemann was an executive of SK Energy and was the senior trader responsible for executive trades on the U.S. West Coast, including in California.  Niemann colluded with Brad Lucas from Vitol, as more fully alleged herein.  On information and belief, David Niemann is a resident of Houston, Texas.

28.     During the relevant period, Defendant Brad Lucas was an executive of Vitol.  Lucas was the primary trader at Vitol with responsibility for trading gasoline and gasoline blending components that were delivered via pipeline within California.  As alleged herein, Lucas and Niemann, along with others, colluded to increase the prices of gasoline in California.   On information and belief, Brad Lucas is a resident of Houston, Texas.

### IV.   AGENTS AND CO-CONSPIRATORS

29.     The anticompetitive and unlawful acts alleged against the Defendants in this class action complaint were authorized, ordered or performed by Defendants' respective officers, agents, employees, or representatives, while actively engaged in the management, direction, or control of Defendants' businesses or affairs.

30.     Defendants' agents operated under the authority and apparent authority of their principals.

31.     Defendants, through their subsidiaries, affiliates and agents operated as a single unified entity.

32.     Various persons and/or firms not named as Defendants herein may have participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.

33.     Each Defendant acted as the principal, agent or joint venture of, or for, other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

34.     When Plaintiff refers to a corporate family or companies by a single name in their allegations of participation in the conspiracy, it is to be understood that the Plaintiff is alleging that one or more employee or agent of entities within the corporate family engaged in conspiratorial acts or meetings on behalf of all of the Defendant companies within that family.  In fact, the individual participants in the conspiratorial meetings and discussions did not distinguish among the entities within a corporate family.  The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families. As a result, the entire corporate family was represented in meetings and discussions by their agents and were parties to the agreements reached by them.  Furthermore, to the extent that subsidiaries within corporate families distributed the alkylate products discussed in this Complaint, these subsidiaries played a significant role in the alleged conspiracy because Defendants wished to ensure that the prices paid for such products would not undercut the pricing agreements reached at these various meetings.  Thus, all Defendant entities within the corporate families were active, knowing participants in the alleged conspiracy.

## V.     CLASS ACTION ALLEGATIONS

35.     Plaintiff brings this action on behalf of himself and as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, seeking damages and equitable relief on behalf of the following Class:

> All persons or entities who purchased refined gasoline at retail in California from February 18, 2015 until the effects of defendants' anticompetitive conduct ceased (the "class period").  Excluded from the class are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, Defendants' attorneys in this case, federal government entities and instrumentalities, states and their subdivisions, all judges assigned to this case, and all jurors in this case.

36.     The number of class members is so large that individual joinder of all members of the class is impracticable.  Plaintiff believes that there are several million class members who are geographically dispersed throughout the State of California.

37.     Common questions of law and fact exist as to all class members and predominate over any questions affecting only individual class members.  Among the questions of law and fact common to the class are:

a.   Whether Defendants and their co-conspirators manipulated the market for the sale of refined gasoline in California;

b.   Whether Defendants and their co-conspirators entered into agreements to set and maintain the price of refined gasoline in California by engaging in trading activity designed to artificially increase the refined gasoline spot price;

c.   Whether Defendants had knowledge of the manipulation;

d.   Whether Defendants took advantage of the manipulation to charge excessive, supracompetitive prices for the sale and distribution of refined gasoline in California;

e.   Whether Defendants' conduct violates the Cartwright Act, Business and Professions Code section 16700 *et seq.*;

f.   Whether Defendants' conduct violates the Unfair Competition Law, Business and Professions Code section 17200, *et seq.*;

g.   Whether Plaintiff and other members of the class were injured in their business or property by reason of Defendants' unlawful conduct;

h.   The measure of damages suffered by Plaintiff and other members of the class; and

i.   Whether Plaintiff and the members of the class are entitled to restitution or other equitable relief under the Unfair Competition Law.

38.     Plaintiff's claims are typical of the claims of the members of the class, and Plaintiff will fairly and adequately protect the interests of the class.  Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other members of the class.  Plaintiff and all members of the class purchased refined gas during the class period and seek relief based on the same legal theories.  Plaintiff's interests are coincident with, and not antagonistic to, those of the other class members, and Plaintiff is represented by counsel who are competent and

1    experienced in the prosecution of antitrust, unfair competition, and class action litigation.

2        39.    Class action treatment is a superior method for the fair and efficient adjudication of

3    the controversy, in that, among other things, such treatment will permit a large number of similarly

4    situated persons to prosecute their common claims in a single forum simultaneously, efficiently

5    and without the unnecessary duplication of evidence, effort and expense that numerous individual

6    actions would engender.   The benefits of proceeding through the class mechanism, including

7    providing injured persons or entities with a method for obtaining redress for claims that it might

8    not be practicable to pursue individually, substantially outweigh any difficulties that may arise in

9    management of this class action.

## VI.    FACTUAL ALLEGATIONS

### A.    California's Gasoline Market

10       40.    Gasoline reaches consumers through a global supply chain that begins with

13   extracting crude oil and transporting it to refineries, mostly via pipelines, marine tankers, and

14   barges.   At the refineries, crude oil is processed into gasoline and other petroleum products.

15   Refined gasoline is then transported—again, usually via pipelines, marine tankers, and barges—

16   to storage terminals for wholesale distribution.   From there, it is shipped by truck to retail gas

17   stations where consumers fill their tanks.   The following chart prepared by the U.S. Governmental

18   Accountability Office ("GAO") visually depicts this supply chain:[4]

---

[4] *See* GAO, *Understanding the Factors That Influence the Retail Price of Gasoline,* May 2005*, at*
2, *available at* https://www.gao.gov/new.items/d05525sp.pdf.

CLASS ACTION COMPLAINT



Figure 2: Gasoline Production and Distribution System

Source: GAO.

41.     California is geographically isolated from refining hubs in the rest of the United States.  There are no pipelines that ship finished gasoline products into California.  When local supplies are insufficient to meet demand in California, additional refined gasoline and gasoline blending components are typically brought into the state on marine vessels.

42.     California also has vehicle emissions standards that are more stringent than other areas of the country. Gasoline produced pursuant to these standards is called California Reformulated Gasoline Blendstock for Oxygenate Blending ("CARBOB"). The CARBOB specifications are unique to California; therefore, gasoline used in neighboring states does not meet the CARBOB specification and cannot be used as a substitute source of supply.

43.     Most of the CARBOB consumed in California is produced by refineries located in clusters near metropolitan centers in the San Francisco Bay Area and in the greater Los Angeles area.

44.     One of the largest refineries in Southern California is located in Torrance, California (the "Torrance Refinery").  The Torrance Refinery produces approximately twenty percent of all of the gasoline sold in Southern California (and ten percent of the statewide supply).

The Torrance Refinery also has the capacity to produce significant quantities of alkylate, a high-quality gasoline blending component.  In 2015, the Torrance Refinery was owned by ExxonMobil Corp. ("ExxonMobil").

45.    When unexpected supply disruptions occur, gasoline meeting California's unique CARBOB specifications must be sourced from outside of California.  Deliveries can take several weeks to arrive at California's ports.

**B.    Gasoline Spot Market Trading In California**

46.    "Spot" purchases refer to fuel that physically changes hands at a refinery gate or other major pricing hub for delivery on a pipeline or via barge or cargo.  Deals are always done in bulk, typically 5,000 barrels (210,000 gallons) to 50,000 barrels (2.1 million gallons).[5]

47.    There are a number of spot markets around the United States.  Spot markets in California include one in San Francisco (for delivery to Northern California refineries located in the Bay Area) and in Los Angeles (for delivery to refineries in greater Los Angeles).  The U.S. spot markets are:[6]



---

[5] *See* https://www.opisnet.com/product/pricing/spot/.

[6] *See* http://blog.opisnet.com/spot-fuel-markets-made-simple.

CLASS ACTION COMPLAINT

48.     The prices on the two California spot markets are influenced by gasoline prices on the New York Mercantile Exchange ("NYMEX").  Prices on the NYMEX are determined in a centralized market: there are typically thousands of gasoline trades on the NYMEX amounting to billions of gallons on every trading day.  Further, all transactions on the NYMEX are publicly reported, so pricing is transparent to market participants.[7]

49.     NYMEX prices generally reflect large-scale national and international factors, while the California spot markets react to the NYMEX price as well as regional and local supply and demand conditions[8].  In many California spot market transactions, the buyer and the seller negotiate only the basis, and the final price is determined by adding the basis to the NYMEX price.[9]

50.     "Rack" or "Wholesale" purchases are made along a fuel distribution system— usually at pipeline terminals.  Transactions are conducted in approximately 8,000 gallon increments, the amount of fuel in a typical fuel truck.  Companies that re-sell fuel (jobbers) as well as retailers or end users (e.g., trucking companies) pull fuel from the wholesale racks.  Wholesale rack prices move up or down each day at 6 p.m. Eastern Time, based on the movements of the spot market.[10]

51.     Wholesale terminals are located throughout the State of California and are located in the following geographically dispersed cities: Bakersfield, Barstow, Brisbane, Carson, Chico, Colton, Eureka, Fremont, Fresno, Imperial, Los Angeles (three locations), Montebello, Orange, Richmond, Sacramento, San Diego, San Francisco, San Jose, Stockton, Van Nuys, and Wilmington.[11]

52.     There are two common grades of CARBOB gasoline that are traded in the San

---

[7] *See id.*

[8] *See* http://blog.opisnet.com/pricing-101-your-basic-guide-to-pricing-gasoline-and-diesel.

[9] *See* http://blog.opisnet.com/spot-fuel-markets-made-simple.

[10] *See* https://www.opisnet.com/product/pricing/rack/.

[11] *See* https://www.opisnet.com/about/rack-pricing-coverage-city/.

Francisco and Los Angeles spot markets. Regular CARBOB ("Regular") is the most commonly traded grade of gasoline. Premium CARBOB ("Premium") is traded with far less frequency than Regular. Premium trades at a higher price than Regular. Alkylate is a high-quality gasoline blending component that can be combined with other blendstocks to create Regular and Premium gasoline. Alkylates are critical to achieving the high octane ratings of Premium gasoline advertised for sale at retail in California.[12]

53.    Unlike the NYMEX, spot market trades in California for both Regular and Premium are traded through non-public transactions, sometimes called over-the-counter ("OTC") trades. These OTC transactions do not occur on a centralized open exchange like the NYMEX, so prices on the California spot markets are not immediately public. Instead, refiners and traders rely on price-reporting services that report spot market prices from sources that participate in the market, such as traders, refiners, and brokers.[13]

54.    The Oil Price Information Service, LLC ("OPIS") is the most widely used reporting service in California. OPIS is a subscription service that publishes a daily OPIS West Coast Spot Market Report (the "Spot Market Report"), which is the industry pricing benchmark used by both buyers and sellers in California. Subscribers to OPIS get the Spot Market Report and can also receive market updates from OPIS throughout the day that include reported deals and other industry news.

55.    The Spot Market Report includes, among other gasoline products, the prices for Regular and Premium gasoline contracts for prompt (i.e., near term) delivery in Southern California and in Northern California. The Spot Market Report also contains forward prices for

---

[12] *See* https://www.eia.gov/todayinenergy/detail.php?id=9971. Approximately 85% of gasoline sold at retail is "regular" gasoline. Another 10% is "premium" gasoline. The remainder is called "midgrade" gasoline. "[R]efineries do not produce a midgrade gasoline blend; instead, the middle-octane option is blended at the fuel pump from a given gas station's supply of regular and premium gas." *See* https://blog.consumerguide.com/what-is-midgrade-gas/.

[13] *See* https://www.opisnet.com/about/methodology/#wholesale-rack-pricing ("OPIS market assessors follow the marketplace throughout a full day of trading by constant communication with designated and approved traders and brokers to discover done deals, bids and offers.").

1  Regular and Premium gasoline.

2      56.    On a daily basis, there are usually many more Regular trades than Premium trades

3  listed in the Spot Market Report.  For example, there could be five, ten, fifteen, or more Regular

4  trades reported on one day compared to one or no Premium trades.  Because trading in Premium

5  is less common than Regular, a single Premium trade that is reported to OPIS tends to have a

6  larger impact on the spot market price of gasoline than a single trade of Regular.

7      57.    Furthermore, as OPIS explains on its website, "[t]he spot market is a critical link in

8  the price influence chain because it sets the basis for cost-plus formula deals between suppliers

9  and end users.  It also forms the rationale for wholesale fuel price moves every day at 6 p.m. at

10  wholesale racks across the U.S.—which then impacts price increases or decreases at the retail

11  pump".[14]

12      58.    OPIS also visually depicts the "price influence chain" between spot prices and the

13  retail prices paid by California consumers:[15]



# The Fuel Price Influence Chain

**NYMEX**
Paper market, influenced by big-scale regional and international factors.

**SPOT MARKET**
Physical market, high volume, located at refinery hubs. Reacts to NYMEX and regional supply news.

**RACK MARKET**
Smaller volume market, often located off a pipeline. Follows spot market direction, changing at 6pm each day.

**RETAIL MARKET**
Street price for gasoline and diesel. Follows rack pricing, though reaction time is usually two/three days later.

© OPIS, an IHS Markit company

**C.    Regulations Governing California Spot Market Trading**

59.    California spot market trading is governed by California's commodities fraud

statute, which provides, among other things, that "willfully employ[ing] any device, scheme, or

[14] *See* https://www.opisnet.com/product/pricing/spot/.

[15] *See* http://blog.opisnet.com/spot-fuel-markets-made-simple.

artifice to defraud," in connection with the purchase or sale of commodity contracts is unlawful. Corp. Code § 29536(a)–(d).

60.     The Federal Commodity Exchange Act similarly prohibits transactions that are: (1) "of the character of, or commonly known to the trade as, a 'wash sale' or 'accommodation trade'"; and (2) "used to cause any price to be reported, registered, or recorded that is not a true and bona fide price." 7 U.S.C. § 6c.

### D.     Defendants' Participation in the California Spot Market

61.     During the relevant period, Vitol was an active participant in trading gasoline in California.  Vitol bought and sold spot market contracts for various types of fuel products, including Regular and Premium.

62.     Vitol imported gasoline and gasoline blending components (such as alkylate) into California.

63.     Vitol employee Brad Lucas ("Lucas") held the title "USWC Trader."  Lucas was the primary trader at Vitol with responsibility for trading gasoline and gasoline blending components that were delivered via pipeline within California.

64.     Lucas reported to John Addison ("Addison"), a Vitol executive who in turn reported to the President of Vitol Americas.  In addition to supervising Lucas, Addison also had trading responsibility that included trading gasoline and gasoline blending components that were primarily delivered via marine vessels to locations in the U.S. West Coast, including California.

65.     During the relevant period, SK Energy and/or SK Trading were active participants in trading gasoline in California.  SK Energy bought and sold spot market contracts for various types of fuel products, including Regular and Premium.

66.     SK Trading and/or SK Energy imported gasoline and gasoline blending components (such as alkylate) into California.

67.     SK Energy employee David Niemann ("Niemann") was the senior trader responsible for executing trades on the U.S. West Coast, including California.  Another SK Energy

employee, Shelly Mohammed ("Mohammed"), held the role of gasoline scheduler and was Niemann's subordinate.

68.     SK Energy functioned as the California trading arm of SK Trading.   While Niemann and Mohammed were nominally employees of Defendant SK Energy, SK Energy's U.S. West Coast Trading Operation was conducted within the continuous and pervasive control and supervision of SK Trading and its subsidiaries, and SK Trading also specifically reviewed and approved key decisions to coordinate trading activities with Vitol.

69.     Lucas and Niemann had ample opportunities to collude throughout the duration of the wrongful conduct outlined in this complaint, via instant messaging, emails and telephone calls, as well as at in-person meetings, dinners, and drinks.

### E.     Defendants' Unlawful Conduct

70.     SK Energy hired Niemann in August 2014 and Niemann immediately began trading gasoline contracts on the California spot market.  Before being hired by SK Energy, Niemann held a similar role at Vitol for approximately ten years.  Niemann and Lucas worked together at Vitol, and they maintained contact after Niemann was hired by SK Energy.  Throughout the Class period, Niemann and Lucas communicated with each other by instant message, emails, telephone calls, and during in-person meetings, dinners, and drinks.

71.     "Fluid catalytic cracking" or "FCC" is an important part of refining crude oil.  A FCC unit is a secondary refining unit that produces high-value products like alkylate.[16]

72.     The Torrance Refinery's FCC unit produced a significant portion of all the high-octane alkylate produced in California.  The alkylate produced at the Torrance Refinery was a key gasoline blending component for Premium gasoline produced in California.

73.     During the morning of February 18, 2015, there was a large explosion at the Torrance Refinery.  The blast occurred in a part of the FCC unit.

74.     The Torrance Refinery was forced to shut down its FCC and reduced production of

---

[16] See https://www.eia.gov/todayinenergy/detail.php?id=9150.

gasoline products, including alkylate, as repair efforts commenced.  As a result of this unplanned outage at the Torrance Refinery—which did not end until approximately June 2016—ExxonMobil needed to replace a significant amount of lost alkylate production in California.

75.     Beginning at least as early as late February 2015, Vitol and SK Energy—through Lucas, Niemann, and others—reached agreements with each other and with third parties to raise, fix, and otherwise tamper with the price of refined gasoline in California by manipulating OPIS-reported prices in order to realize supra-competitive profits while limiting bona fide market risk. The explosion at the Torrance Refinery would act as cover for their illegal efforts to increase the price of gasoline on the California spot markets.

76.     Vitol and SK Energy specifically engaged in trades directly or indirectly between them that were reported to OPIS for the purpose of inflating the OPIS-published price for Regular and Premium gasoline.  At times they used the services of an intermediary broker, and sometimes they transacted directly with each other.

77.     This conduct was designed to create the illusion of a supply/demand imbalance for refined gasoline and to drive spot market prices to artificial highs during strategic pricing windows.

78.     Many of these transactions were "leveraged" because they involved taking losses on the purchase of smaller quantities of gasoline to increase the profits on the sale of larger quantities of gasoline or alkylate.

79.     For example, Defendants traded Regular gasoline contracts directly or indirectly with each other at artificially high prices early in the trading day so that OPIS would report artificially inflated purchase price to other market participants.  An early purchase during a strategic trading window at an inflated price signals a supply/demand imbalance to the market and thereby artificially inflates spot market prices.

80.     Defendants also executed market-spiking trades for Premium gasoline directly or indirectly with each other and third parties, and then reported these trades to OPIS.  Because

Premium gasoline trades were rare—often only zero or one of these trades were reported on any given day—these transactions had a significant impact on the spot market price.

81.     Defendants engaged in market-spiking spot trades for Premium gasoline to increase the OPIS-reported price for Premium during strategic pricing windows for large sales of alkylates. While alkylate is a key blending component for Premium gasoline, alkylate is not a separately reported commodity on California's spot markets.  Consequently, large price contracts for alkylate were most commonly tied, with a small differential, to the OPIS-reported spot price for Premium gasoline during the associated pricing window.

82.     Defendants' manipulation of spot prices for Regular gasoline also affected alkylate contract prices because spot prices for Regular and Premium gasoline often move in tandem.

83.     Therefore, to realize supra-competitive profits on alkylate contracts, Vitol and SK worked together to inflate the spot price of Regular and Premium gasoline during key pricing windows, and then coordinated their importation of alkylate into California at these supra-competitive prices.

84.     Defendants also executed secondary offsetting or "wash" trades to hide or disguise their conduct, to limit or eliminate bona fide market risk on the reported trades, and to share their anticompetitive profits with each other.  Defendants withheld disclosure from OPIS of these "wash" trades between them, or otherwise disguised them by transacting them through brokers or other third parties.  These secondary trades were executed at the same time, before, or after the OPIS-reported trades.

85.     The CME defines a "wash trade" as follows: "A wash trade is a form of *fictitious trade* in which a transaction or a series of transactions give the appearance that authentic purchases and sales have been made, but where the trades have been entered without the intent to take a *bona fide market position* or without the intent to execute bona fide transactions subject to *market risk* or *price competition*."[17]

---

[17] https://www.cmegroup.com/education/courses/market-regulation/wash-trades/definition-of-a-

86.    By moving in the opposite direction of the reported trade, the secondary transaction ensured that there was little or no market risk associated with Defendants' overall conduct.

87.    Defendants called their illegal agreements "joint ventures" or "JVs", but they were nothing more than secret agreements between purported competitors to artificially increase spot market prices for Regular and Premium gasoline in California.  These agreements started out as verbal agreements only, but were later referenced in various writings.  During the Class period, Defendants' illegal conduct generated millions of dollars of profits for them per month, and Lucas and Neimann also financially benefitted as a result of their conduct.

88.    The price-spikes caused by Defendants' illegal conduct were not consistent with prior actual or perceived supply disruptions within California.  The following chart, published by Severin Borenstein, chair of the PMAC—which was formed to investigate gasoline pricing in California between late 2014 and the end of 2016—depicts the historically unprecedented change in gasoline pricing in California relative to the United States that was caused by—and lingered—as a result of Defendants' conduct:[18]

---

wash-trade.html (emphasis in original).

[18] *See* Severin Borenstein, *California's Mystery Gasoline Surcharge Continues,* Feb. 26, 2018, *available at* https://energyathaas.wordpress.com/2018/02/26/californias-mystery-gasoline-surcharge-continues/.

CLASS ACTION COMPLAINT



89.     Nor were the spot market price spikes explained by any actual decrease in gasoline production following the Torrance Refinery explosion.  As the PMAC's Final Report explained, "Energy Commission staff noted that while the ESP tower and FCCU of the refinery remained off-line until June 2016, the refinery could still create finished gasoline from processed blending components, some of which may be imported."[19]

90.     In fact, the PMAC demonstrated that overall gasoline production in California was well within the historical five-year production band immediately following the Torrance Refinery explosion and for the remainder of 2015, as depicted in the following chart:[20]

---

[19] *See Petroleum Market Advisory Committee Final Report – December 2014 to November 2016*, Sept. 2017 ("PMAC Final Report"), at 12, *available at* https://ww2.energy.ca.gov/business_meetings/2017_packets/2017-09-13/Item_01a.pdf.

[20] *Id.*



91.    The following chart demonstrates that the Defendants' spot price manipulation, which was in full swing not later than February 2015, impacted CARBOB spot prices in both San Francisco and Los Angeles, whose markets move in tandem:[21]

---

[21] *See Data on California Gasoline Price Margins,* at 5, *available at* https://www.energy.ca.gov/sites/default/files/2019-05/Data_on_California_Gasoline_Price_Margins.pdf.



92.     Spot price manipulation increases the price of gasoline at all retailer distribution outlets, whether they supply branded or unbranded gasoline (i.e., gas sold by retail discounters like Arco, Safeway, and Costco).  In fact, the PMAC demonstrated that prices for branded and unbranded gasoline move in tandem, with branded pricing slightly higher than unbranded pricing.[22]

_____

[22] *See PMAC Final Report,* at 29.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15



Figure 15: Average Retail California Regular Gasoline Prices by Branded and Unbranded Retail Sectors, 2007 to 2016

Source: California Energy Commission analysis of OPIS information

16      93.    No retailer in the State of California was spared cost increases caused by

17  Defendants' misconduct, and empirical research demonstrates what industry participants have

18  long known—that upstream wholesale price increases are quickly passed on to consumers, but

19  that price declines lag.  Jeffery Karrenbock ("Karrenbock"), an economist at the Federal Reserve

20  Bank of St. Louis visually depicted this phenomenon in the following chart:[23]

21
22
23
24

25  [23] *See* Jeffrey D. Karrenbock, *The Behavior of Retail Gasoline Prices: Symmetric or Not?*,
    *Federal Reserve Bank of St. Louis Rev.*, 19 (July/Aug. 1991), *available at*
26  https://pdfs.semanticscholar.org/0f7f/2cff4ed046fecbadee1697aec85834fb65c1.pdf?_ga=2.14840
    6911.934618284.1593395138-207692270.1593395138.
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15



Figure 2
U.S. Average Retail and Wholesale Gasoline Prices[1]

¹Retail prices include federal and state tax.

16    94.    Karrenbock demonstrated econometrically that while wholesale price increases

17 were immediately passed through to retail gasoline price changes, wholesale price declines lagged.

18 He graphed his results as follows:[24]

19
20
21
22
23
24
25
26

_____

[24] *Id.*

27

28

CLASS ACTION COMPLAINT





95.     Karrenbock noted that his findings are consistent with the comments of industry as the following quotes demonstrate:

- "Retail (gasoline) prices go up much faster than they come down."— a spokesman for the Automobile Association of America.  The Wall Street Journal (Solomon), August 9, 1990.

- "Pump prices are fast to respond to rising prices but slower to fall when crude prices fall."—Antonio Szabo, oil consultant with Bonner & Moore. The Wall Street Journal (Business Bulletin), August 3, 1989.

- "Whenever oil prices fall, there is always this stickiness in gasoline prices on the way down.  You never see this stickiness on the way up."—Ed Rothschild, energy expert at Citizen Action.  New York Times (Wald), July 2, 1990.

- "When crude prices go up, product prices tend to rise with crude prices. But when crude prices go down, product prices tend to lag— they go down slowly."—John Hilton, oil industry analyst for Argus Research Corp.  St. Louis Post-Dispatch (Crudele), June 19, 1990.[25]

---

[25] *See id.*

96.     As noted above, the strong connection between wholesale and retail gasoline prices continues today.  As OPIS explains on its website, "[t]he spot market is a *critical link* in the price influence chain *because it sets the basis for cost-plus formula deals between suppliers and end users*.  It also forms the rationale for wholesale fuel price moves every day at 6 p.m. at wholesale racks across the U.S.—which then impacts price increases or decreases at the retail pump."[26]

97.     Defendants' repeated manipulation of the spot market price caused retail gasoline prices to be higher throughout the class period.

98.     Defendants' gains came at the expense of consumers throughout California, who use 40 million gallons of gasoline per day.  California is the third largest market in the world behind the U.S. as a whole and China.[27]

99.     PMAC concluded its study of the California gasoline market as follows: "Californians continue to pay more than $3 billion per year for gasoline above the levels that could be explained by standard cost analysis.  Whether the cause of these excess payments is insufficient competition or logistical impediments, or some combination of these factors, the magnitude of the loss justifies a very significant effort to diagnose its causes and remedy the situation."[28]

100.    As demonstrated by the filing of the AG's Complaint on May 4, 2020, Senior Assistant Attorney General Kathleen Foote and her team of antitrust attorneys were able to pursue a non-public investigation into the causes of gasoline prices following the Torrance Refinery explosion and uncover secret evidence that Defendants had illegally colluded with each other and

---

[26] *See* https://www.opisnet.com/product/pricing/spot/ (emphasis added); *see also* https://stillwaterassociates.com/gasoline-retail-margin-quick-to-rise-slow-to-drop/ ("We note that retail prices continue to respond quickly to increases in the spot price, but they respond more slowly to decreases in the spot price.").

[27] *See* Jude Clemente, *Why are California's Gasoline Prices Always Higher,* Forbes (Mar. 22, 2015), *available at* https://www.forbes.com/sites/judeclemente/2015/03/22/why-are-californias-gasoline-prices-always-higher/#30bdca9821ff.

[28] *See PMAC Final Report,* at 33.

1    third parties to increase the price of gasoline to levels above what competition would have allowed.

2        101.    The affirmative conduct underlying the illegal conduct alleged herein likely ended

3    at or around the time that Niemann left SK Energy in late 2016.

4    **VII.    PLAINTIFF AND THE CLASS SUFFERED ANTITRUST INJURY**

5        102.    Defendants' illicit trading activities had the effect of manipulating the spot price of

6    refined gasoline, which spot price manipulation translated directly into the retail price of gasoline

7    paid by California consumers.  Defendants' conduct at issue caused California consumers like

8    Plaintiff and the Class to pay more for refined gasoline than they otherwise would have.

9        103.    During the Class Period, Plaintiffs and members of the Class paid artificially

10   inflated prices for gasoline.  Gasoline retailers and other resellers of refined gasoline passed on

11   inflated prices to Plaintiffs and members of the Classes.  Defendants were unjustly enriched by

12   their gasoline spot price manipulation.

13       104.    The spot market and retail market for refined gasoline are directly linked and

14   intertwined because the spot market for refined gasoline exists to serve the retail market for

15   gasoline.  Refined gasoline follows a simple chain of distribution from the wholesale spot market

16   to the retail market for gasoline; *e.g.*, there are typically one or two links between

17   refiners/wholesale racks and consumers purchasing at retail.

18       105.    The spot market price for refined gasoline can be traced to show that changes in the

19   prices paid by participants in the spot market for refined gasoline affect prices paid by Plaintiffs

20   and members of the Class for gasoline sold at retail.

21       106.    While even a monopolist would increase its prices when the cost of its inputs

22   increased, the economic necessity of passing through cost changes increases with the degree of

23   competition a firm faces.  The market for refined gasoline downstream from the spot market for

24   refined gasoline is highly competitive.  For example, gas stations typically post their prices on

25   large street-side signs.  Since consumers are very sensitive to price, gas stations often strive to

26   meet or beat their competitors' posted rates so they do not lose customers.  As a result, competing

27

28

gas stations often charge similar or identical prices.

107.   Two antitrust scholars—Professors Robert G. Harris (Professor Emeritus and former Chair of the Business and Public Policy Group at the Haas School of Business at the University of California at Berkeley) and the late Lawrence A. Sullivan (Professor of Law Emeritus at Southwestern Law School and author of the Handbook of the Law of Antitrust)—have observed that "in a multiple-level chain of distribution, passing on monopoly overcharges is not the exception: it is the rule."

108.   As Professor Jeffrey K. MacKie-Mason (Arthur W. Burks Professor for Information and Computer Science and Professor of Economics and Public Policy at the University of Michigan), an expert who presented evidence in a number of indirect purchaser cases involving Microsoft Corporation, said (in a passage quoted in the judicial decision in that case granting class certification):

> As is well known in economic theory and practice, at least some of the overcharge will be passed on by distributors to end consumers.  When the distribution markets are highly competitive, as they are here, all or nearly the entire overcharge will be passed on through to ultimate consumers . . . .  Both of Microsoft's experts also agree upon the economic phenomenon of cost pass through, and how it works in competitive markets.  This general phenomenon of cost pass through is well established in antitrust laws and economics as well.

109.   Suppliers of a product will pass through variable cost increases (as opposed to increases in fixed costs) to avoid lost profits.  Here, refined gasoline is an important variable cost for refined gasoline wholesalers, distributors, jobbers and retailers.  In fact, refined gasoline costs, as a percentage of all retailer costs to sell gasoline, and excluding state and federal taxes, amount to over 85 percent of total costs of gasoline sold at retail.

110.   Suppliers of a product will pass through cost increases in inelastic markets.  Here, the market for retail gasoline is inelastic, meaning changes in prices have little influence on demand.  Demand in the market for refined gasoline is derived from consumer demand for gasoline sold at retail.  Suppliers and resellers of refined gasoline can therefore pass through cost

1    increases without fear of losing sales.

2        111.    Where there is an industry-wide overcharge, competing purchaser-suppliers will

3    generally pass through overcharges.  Here, the reseller markets for refined gasoline below the spot

4    market, including the retail market, are highly competitive.  In addition, Defendants' conduct was

5    not directed at a portion of the California market for refined gasoline.  Defendants sought to, and

6    did, implement a California-wide overcharge.  As a result, refined gasoline resellers passed

7    through the market-wide overcharges they paid for refined gasoline to their customers.

8        112.    Finally, firms are more likely to pass through non-transitory price increases.  Here,

9    the alleged conspiracy increased prices for refined gasoline over a multi-year period.  These were

10   not transitory increases.

11       113.    The extent to which gasoline prices in California were impacted by Defendants'

12   illicit trading activities may be empirically studied to compare the prices that actually prevailed

13   during the class period to those which would have prevailed during the class period absent the

14   conduct of Defendants (the "but-for" prices).  The Defendants engaged in a variety of actions

15   designed to manipulate gasoline spot market prices including inflating trades, loss-leader

16   transactions, wash trades, and unreported trades, among other activities.  There exist empirical

17   methodologies that may be employed to quantify the extent to which gasoline prices in the spot

18   market were manipulated by Defendants' conduct.

19       114.    Economists have developed techniques to isolate and understand the relationship

20   between one "explanatory" variable and a "dependent" variable in those cases when changes in

21   the dependent variable are explained by changes in a multitude of variables, even when all such

22   variables may be changing simultaneously.  That analysis—called regression analysis—is

23   commonly used in the business world, academia, and in litigation to determine the impact of a

24   price increase on a product (or service) that is an assemblage of costs.  Thus, it is possible to isolate

25   and identify only the impact of an increase in the spot price of gasoline on downstream resellers'

26   prices for refined gasoline even though such resale may require other costs that may be changing

27

28

over time.  A regression model can explain how variation in the spot price of refined gasoline affects changes in the retail price of gasoline.  In such models, the price of refined gasoline in the spot market would be treated as an independent or explanatory variable.  The model can isolate how changes in the price of the refined gasoline in the spot market impact the price of gasoline in the retail market while controlling for the impact of other price-determining factors.

115.    The precise amount of the overcharge impacting the price of refined gasoline in the spot market can be measured and quantified.  Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the overcharge passed through the chain of distribution.  Thus, the economic harm to Plaintiff and class members can be quantified.

116.    By reason of the violations of the antitrust law alleged herein, Plaintiff and members of the Class have sustained injury to their businesses or property, having paid higher prices for retail gasoline than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy, and, as a result, have suffered damages in an amount presently undetermined.  This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## VIII.    <u>TOLLING OF THE STATUTES OF LIMITATIONS</u>

117.    Class member purchases of gasoline within four years prior to the filing of this Complaint are not barred by the applicable four-year statute of limitations and are not required to be tolled in order to be actionable.

118.    Plaintiff and the Class did not know of Defendants' illegal conduct until the California Attorney General filed his complaint against Defendants on May 4, 2020.  Further, Plaintiff and the Class had no reason to believe that they paid prices for gasoline that were affected by Defendants' illegal conduct prior to that date, and thus had no duty to investigate the claims set forth in this Complaint until May 4, 2020.  Defendants' secret joint venture agreements were inherently self-concealing.

119.    Additionally, Defendants engaged in affirmative conduct that was designed to mislead and conceal their illegal conduct.  For example, Vitol's Lucas affirmatively mislead the California Energy Commission ("CEC") about the true cause of high prices for gasoline that followed the Torrance Refinery explosion in February 2015.  On August 16, 2016, he told the PMAC, including Kathleen Foote, Senior Assistant Attorney General and Chief of the Antitrust Division, that high gasoline prices were caused by a lack of transparency by ExxonMobil, rather than Defendants' illegal manipulation of spot market prices.  Lucas stated:

> So you know, last year we brought in quite a few cargos into L.A., both alkaloid (phonetic) and finish CARBOB that went through Kinder Morgan's system and sold direct to Exxon and some other refiners.  You know, one of the big things that this whole conversation has entailed is about the high prices.  One of the reasons why, in my opinion, was the lack of transparency with what was going on with Torrance.  Because if you remember when it first blew up back in February, there was like an eternal rolling one-month period where they were going to get back up and running.  And they kept saying next month, next month, next month.  So the trading companies in general, it takes four to five weeks to ship a cargo out, if Exxon is coming back up they're not going to ship into closed ARB.  So because there was no real timeline of when Exxon was going to come back up and running, we would generally not—you don't put cargos on the water and ship them to the West Coast just on a punt, basically, hoping that you can sell them when they get there.  That's what happened with that one cargo that was done by another trading company who sent it out there, at which point in time the market had collapsed, and so he was unable to sell it, and so he sailed it away again.  So that's what happened with that one.  So if there was more transparency with what was going on with refinery maintenance, when it was going to come back up, it would have allowed us to see if it was more—if we were going to be able to land these cargos and actually into a competitive market.  If Exxon is back up and running the market is going to fall dramatically.  So basically kind of that lack of information kept cargos at bay.  There were still a lot shipped into the West Coast, but not as many as could have been or would have been done.  If we had actually known that Exxon was going to be down for over a year there would have been a much bigger import play over that time frame.[29]

120.    Moreover, Defendants repeatedly misled OPIS about the true nature of their trading

---

[29] *See* PMAC August 16, 2016 Meeting Transcript at 129:24-131:10, *available at* https://www.energy.ca.gov/data-reports/planning-and-forecasting/petroleum-market-advisory-committee.

CLASS ACTION COMPLAINT

activities by reporting artificially high spot trades directly or indirectly between them, but concealing the existence of offsetting wash trades that reduced or effectively limited any market risk in the primary trade.

121.    Additionally, the California Attorney General, as representative of the people of the State of California, obtained tolling agreements with Defendants that are applicable to the claims of Plaintiff and the Class, in whole or in part.  These tolling agreements have effective dates of August 3, 2018, and March 8, 2019, respectively.  Defendants and the California Attorney General subsequently executed additional tolling agreements to extend the termination dates of the tolling periods specified in the original agreements.

122.    Accordingly, to the extent that tolling is necessary to advance some or all of the claims alleged by Plaintiff and the Class, the four-year statutes of limitations governing claims under the Sherman Act, the Cartwright Act, and the UCL were tolled at least until May 4, 2020 pursuant to the injury-discovery rule, the doctrine of fraudulent concealment, and by virtue of express tolling agreements between the California Attorney General and Defendants.

## IX.   CLAIMS FOR RELIEF

### COUNT ONE

### Violation of the Sherman Act

### (15 U.S.C. § 1—Injunctive Relief Only)

### (Against all Defendants)

123.    Plaintiff hereby repeats and incorporates by reference each of the preceding paragraphs as though fully set forth herein.  Plaintiff brings this claim on behalf of himself and the Class.

124.    Defendants entered into and engaged in a continuing combination, conspiracy or agreement to unreasonably restrain trade or commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially restraining competition with respect to the price of gasoline within the State of California.

125.    Defendants' activities constitute a *per se* violation of Sections 1 of the Sherman Act.

126.    Defendants' anticompetitive and unlawful conduct has proximately caused injury to Plaintiff and members of the Class by restraining competition and thereby raising, maintaining and/or stabilizing the price of gasoline at levels above what would have occurred if competition had prevailed.

127.    Plaintiff and members of the Class have been injured and will continue to be injured in their businesses and property by paying higher gasoline prices than they would have paid and will pay in the absence of the combination and conspiracy.

128.    Pursuant to 15 U.S.C. § 26, Plaintiff and members of the Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

## COUNT TWO

### Violation of the Cartwright Act

### (California Business and Professions Code section 16720 *et seq.*)

### (Against all Defendants)

129.    Plaintiff incorporates by reference and realleges the preceding allegations as though fully set forth herein.

130.    Defendants entered into and engaged in a continuing combination, conspiracy or agreement to unreasonably restrain trade or commerce in violation of California Business and Professions Code § 16720 *et seq.* by artificially restraining competition with respect to the price of gasoline within the State of California.

131.    Defendants' activities constitute a *per se* violation of the Cartwright Act.

132.    Defendants' anticompetitive and unlawful conduct has proximately caused injury to Plaintiff and members of the Class by restraining competition and thereby raising, maintaining and/or stabilizing the price of gasoline at levels above what would have occurred if competition had prevailed.  Plaintiff and members of the Class accordingly seek treble damages and injunctive

relief pursuant to California Business and Professions Code section 16750(a).

**COUNT THREE**

**Violation of the Unfair Competition Law**

**(California Business and Professions Code section 17200 *et seq*.)**

**(Against all Defendants)**

133.    Plaintiff incorporates by reference and realleges the preceding allegations as though fully set forth herein.

134.    Defendants committed acts of unfair competition, as described above, in violation of the UCL.

135.    Defendants' conduct constitutes an "unlawful" business practice within the meaning of the UCL, and includes, without limitation, the following:

- Violating the Sherman and Cartwright Acts, as set forth above;

- Engaging in, among other actions, wash sales and otherwise manipulating the benchmark prices reported on the California gasoline spot market in violation of California Corporations Code §§ 29535, 29536, 29537, 29538 and the Commodity Exchange Act, 7 U.S.C. § 1 *et seq*.

136.    Defendants' conduct separately constitutes an "unfair" business practice within the meaning of the UCL because Defendants' practices have caused and are "likely to cause substantial injury" to the Plaintiff and the members of the Class that is not "reasonably avoidable" by them.

137.    Defendants' conduct, as alleged herein, is and was contrary to public policy, immoral, unethical, oppressive, unscrupulous and/or substantially injurious to consumers.  Any purported benefits arising out of Defendants' conduct do not outweigh the harms caused to the victims of Defendants' conduct.

138.    Defendants' conduct is also "unfair" because it is contrary to numerous legislatively-declared policies, as set forth in the Sherman Act, the Cartwright Act, the California

34

**CLASS ACTION COMPLAINT**

Corporations Code and in the Commodities Exchange Act.  Here, Defendants' conduct not only violates the letter of the law, but it also contravenes the spirit and purpose of each of those statutes. The conduct threatens an incipient violation of each of those laws and has both an actual and a threatened impact on competition.

139.    Defendants' conduct, as described above, also constitutes a "fraudulent" business practice within the meaning of the UCL.  Defendants' trading activity on the California gasoline spot market fraudulently raised the price of gasoline above the competitive level through fictitious "wash" trades and other manipulative conduct that did not shift economic risk for the transaction to an arm's length counterparty.  This conduct was designed to deceive—and did deceive—other market participants about the true supply and demand situation for gasoline in order to artificially increase the price of gasoline in California.

140.    Plaintiff and the members of the Class have suffered injury in fact and have lost money as a result of Defendants' violations of the UCL in that they paid more for gasoline than they would have paid in a competitive market.  They are therefore entitled to restitution and injunctive relief pursuant to California Business and Professions Code §17203.

## COUNT FOUR

### Unjust Enrichment, Restitution and Disgorgement of Profits

### (Against All Defendants)

141.    Plaintiff incorporates by reference and realleges the preceding allegations as though fully set forth herein.

142.    Defendants have been unjustly enriched through overpayments by Plaintiff and the Class and their resulting profits.

143.    Under common law principles of unjust enrichment, Defendants should not be permitted to retain the benefits conferred via overpayments by class members.

144.    Plaintiff and the Class seek restitution and disgorgement of all profits resulting from such overpayments and establishment of a constructive trust from which Plaintiff and the Class

1 | may seek restitution.

2 | **PRAYER FOR RELIEF**

3 |        WHEREFORE, Plaintiff requests that the Court enter judgment on his behalf and

4 | on behalf of the Class defined herein, by adjudging and decreeing that:

5 |
6 | A.    This action may proceed as a class action, with Plaintiff serving as the Class Representative, and with Plaintiff's counsel as Class Counsel;

7 | B.    Defendants have contracted, combined and conspired in violation of the Sherman Act and Cartwright Act;

8 |
9 | C.    Defendants have violated the UCL by engaging in conduct that constitutes unlawful, unfair and fraudulent business practices;

10 | D.    Plaintiff and the Class have been injured in their business and property as a result of Defendants' violations;

11 |
12 | E.    Plaintiff and the Class are entitled to recover three-fold damages and/or restitution, and that a joint and several judgment in favor of Plaintiff and the Class be entered against Defendants in an amount subject to proof at
13 | trial;

14 | F.    Plaintiff and the Class are entitled to pre-judgment and post-judgment interest on the damages awarded them, and that such interest be awarded
15 | at the highest legal rate;

16 | G.    Plaintiff and the Class are entitled to equitable relief appropriate to remedy Defendants' past and ongoing restraint of trade, including:
17 |
18 |     i.    A judicial determination declaring the rights of Plaintiff and the Class, and the corresponding responsibilities of Defendants; and

19 |     ii.    Issuance of a permanent injunction against Defendants and their
20 | parents, subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents,
21 | and employees thereof and all other persons acting or claiming to act on their behalf from violations of the law as alleged herein.

22 | H.    Defendants are to be jointly and severally responsible financially for the
23 | costs and expenses of a Court-approved notice program through post and media designed to give immediate notification to the Class;

24 | I.    Plaintiff and the Class recover their costs of this suit, including reasonable
25 | attorneys' fees as provided by law; and

26 | J.    Plaintiff and the Class receive such other or further relief as may be just and proper.

27 |

28 |

36
CLASS ACTION COMPLAINT

1

## **<u>JURY TRIAL DEMANDED</u>**

2          Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury

3    of all the claims asserted in this Complaint that are so triable.

4    Dated:  June 29, 2020                    */s/ Christopher T. Micheletti*

5                                             Christopher T. Micheletti (SBN 136446)
                                             Judith A. Zahid (SBN 215418)
6                                            Qianwei Fu (SBN 242669)
                                             **ZELLE LLP**
7                                            44 Montgomery Street, Suite 3400
                                             San Francisco, CA 94104
8                                            Telephone: (415) 693-0700
                                             cmicheletti @zelle.com
9                                            jzahid@zelle.com
                                             qfu@zelle.com
10

11                                           James R. Martin (SBN 173329)
                                             Jennifer Duncan Hackett (*pro hac vice*
12                                             forthcoming)
                                             **ZELLE LLP**
13                                           1775 Pennsylvania Avenue, NW, Suite 375
                                             Washington, D.C. 20006
14                                           Telephone: (202) 899-4100
                                             jmartin@zelle.com
15                                           jhackett@zelle.com

16
                                             *Attorneys for Plaintiff Craig Kelly*
17

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT